**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,    )
                             )
      Plaintiff,        )
                             )
      v.                 ) No. 4:24-CR-00227-SEP
                             )
                             )
DAVID S. BECKER,        )
                             )
      Defendant.        )

**EVIDENTIARY HEARING**

**BEFORE THE HONORABLE PATRICIA L. COHEN**
**UNITED STATES MAGISTRATE JUDGE**

**DECEMBER 12, 2024**

APPEARANCES:

For Plaintiff:      Jillian S. Anderson, Esq.
                    OFFICE OF THE U.S. ATTORNEY
                    111 South 10th Street, 20th Floor
                    St. Louis, MO 63102

For Defendant:      Joseph M. Hogan, Esq.
                    LAW OFFICES OF JOSEPH M. HOGAN
                    7751 Carondelet Avenue, Suite 700
                    Clayton, MO  63105

Reported By:        Kristine A. Toennies, RMR, CRR, CSR, CRC
                    Official Court Reporter
                    United States District Court
                    111 South 10th Street
                    St. Louis, MO 63102 | (314)244-6701

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1                            <u>INDEX</u>

2    GOVERNMENT'S EVIDENCE

3         <u>AMY ERWIN</u>

4         Direct Examination by Ms. Anderson              4

5         Cross-Examination by Mr. Hogan                 26

6         Redirect Examination by Ms. Anderson           36

7

8    Reporter's Certificate                             45

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1                         DECEMBER 12, 2024

2              (The proceedings commenced at 1:34 p.m. and were

3    held in open court with the defendant present.)

4              **THE COURT:**  Good afternoon.  So we're on the record

5    in *USA vs. Becker*, 4:24-CR-227.  Let's get an announcement as

6    to who's present.  Come up to the podium, Mr. Hogan.

7              **MR. HOGAN:**  Good afternoon, Your Honor.  Joseph

8    Hogan on behalf of the defendant, David Becker, Your Honor.

9              **MS. ANDERSON:**  And Jillian Anderson, Your Honor, for

10   the government.

11             **THE COURT:**  Okay.  So let's talk about what we're

12   doing first.  We've got a motion to suppress evidence that's

13   Doc No. 38, and am I correct that we are going to proceed with

14   a hearing this afternoon?

15             **MR. HOGAN:**  Yes, Your Honor.

16             **THE COURT:**  Okay.  And Doc 38, which is the motion

17   to suppress, is the only motion we're taking up today; right?

18             **MR. HOGAN:**  That is correct, Your Honor.

19             **THE COURT:**  Okay.  Anything from the government?

20             **MS. ANDERSON:**  No, Your Honor.

21             **THE COURT:**  All right.  So any reason not to get

22   started right now?

23             **MS. ANDERSON:**  No, Your Honor.

24             **MR. HOGAN:**  No, Your Honor.

25             **THE COURT:**  All right.  So go have a seat,

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  Mr. Hogan, and Ms. Anderson, do you want to call a witness, if
2  you've got one?

3          **MS. ANDERSON:**  Thank you, Your Honor.  Your Honor,
4  the government would call Detective Amy Erwin.

5          (Witness sworn in by the deputy clerk.)

6          **THE COURT:**  Detective Erwin, do you want to come
7  around here.  Just speak into the mic and try to keep your
8  voice up; okay?

9          **THE WITNESS:**  Yes.

10          **MS. ANDERSON:**  Thank you, Your Honor.

11                    **AMY ERWIN,**
12  having been first duly sworn in by the clerk, testified:

13                  **DIRECT EXAMINATION**

14  **BY MS. ANDERSON:**

15  Q.  Detective Erwin, can you introduce yourself to the Court,
16  and in that introduction, can you give a brief summary of your
17  experience as a law enforcement officer.

18  A.  Yes.  My name is Amy Erwin, and I am a detective with the
19  St. Louis County Police Department Special Investigations
20  Unit.  I've been with the department now for -- sorry, my mask
21  is falling.  I've been with the department for over 22 years.
22  I've been assigned to my particular unit coming up on 13 years
23  now.

24          Do you want me to talk more about what I do?

25  Q.  Well, I'll follow up with a question.  You said you've

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1    been with your current unit for about 13 years.  What are your

2    duties within that unit?

3    A.    I am an ICAC investigator, so I do Internet Crimes

4    Against Children investigations, so that generally involves

5    like child sexual exploitation involving child pornography,

6    child enticement, things of that nature.

7    Q.    And during your time as an Internet Crimes Against

8    Children detective for the past 13 years, is it fair to say

9    that you have had numerous opportunities to investigate child

10   pornography cases?

11   A.    Yes.

12   Q.    Is it fair to say that you have had the opportunity or

13   really the duty in the course of your career to view thousands

14   and thousands and thousands of images of child pornography?

15   A.    Yes; files, images, and videos.

16   Q.    And during the last 13 years working child internet

17   exploitation cases, have you had the opportunity to present

18   search warrants to state and federal judges in child

19   pornography cases?

20   A.    I have.

21   Q.    Could you begin to sort of estimate how many or how

22   frequently you present search warrants?

23   A.    Yes.  I mean, I would say a very conservative number

24   would be like 30 search warrants involving child pornography a

25   year.  That alone would put it at over 300, and I think that

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  is very conservative.

2  Q.   And do a significant number of those search warrants

3  involve investigations that included CyberTipline reports from

4  the National Center for Missing and Exploited Children?

5  A.   Yes.

6  Q.   And when you receive those reports, in the course of

7  those investigations prior to applying for the search warrant,

8  have you frequently had occasion to view the suspected child

9  pornography material that was reported to the National Center

10  for Missing and Exploited Children to make your own judgment

11  about whether, in fact, that image or video does depict a

12  minor subjected to sexually explicit conduct or lascivious

13  display of their genitals?

14  A.   Yes, always.

15          **MS. ANDERSON:**  May I approach the witness, Your

16  Honor?

17          **THE COURT:**  Yes, sure.

18  Q.   (By Ms. Anderson) Detective Erwin, in addition to your

19  experience investigating child pornography cases and applying

20  for search warrants on those cases and viewing child

21  pornography material, have you also had the occasion to be

22  trained about child pornography investigations or internet

23  crimes against children?

24  A.   Yes.

25  Q.   And I have shown you a document that is labeled with a

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  sticker Government's Exhibit 1.  Do you recognize what that

2  is?

3  A.   Yes.  It's a list of specialized training I've received.

4  Q.   Okay.  And this is training that you have received during

5  your career?

6  A.   Yes.

7      **MS. ANDERSON:**  Your Honor, the government would move

8  Government's Exhibit 1 into evidence at this time.

9      **THE COURT:**  Do you have a copy of that?

10     **MS. ANDERSON:**  I do, Your Honor.  May I approach,

11 Your Honor?

12     **THE COURT:**  Okay.  Is there any objection to

13 Government Exhibit 1?

14     **MR. HOGAN:**  No, Your Honor.  I've been previously

15 given a copy of it.

16     **THE COURT:**  All right.  That's admitted.

17 Q.   (By Ms. Anderson) And during the time that you have been

18 investigating child pornography offenses and internet crimes

19 against children, have you had occasion to make judgments

20 during the course of an investigation -- it could be at

21 multiple stages -- that material you are viewing was, in fact,

22 or did appear to depict child pornography?

23 A.   Yes.

24 Q.   I want to turn your attention, Detective Erwin, to about

25 March of 2023.  At that time were you assigned an

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  investigation by your supervisor involving a CyberTipline

2  report from Microsoft, specifically the Skype, the Skype

3  application?

4  A.    Yes, I was.

5  Q.    Okay.

6        **MS. ANDERSON:**  May I approach the witness, Your

7  Honor?

8  Q.    (By Ms. Anderson) And was that CyberTipline report Report

9  Number 140974712?

10  A.    Yes.

11  Q.    Okay.  And did that CyberTipline report go to the

12  National Center for Missing and Exploited Children from

13  Microsoft?

14  A.    Yes.

15  Q.    And did you have an opportunity when you were assigned

16  this investigation to review this CyberTipline report?

17  A.    I did.

18  Q.    And I want to draw your attention -- let me ask you, I

19  have handed you a multiple-page document that is labeled with

20  a sticker that indicates that it is Government's Exhibit 2.

21  Do you recognize what that is?

22  A.    Yes.  This is the CyberTip that you just referred to.

23  Q.    And I want to turn your attention specifically to what

24  would be I think page 4 of that document.

25  A.    The labeled 4 by NCMEC or just the fourth page?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  Q.   The fourth actual page.  And in the CyberTip report, did

2  Microsoft indicate what -- one of their functions, Microsoft,

3  of course, is involved in lots of different computer

4  enterprises.  What specific application or function did they

5  observe a concerning file of child pornography on?

6  A.   They indicated it was on Skype via their photo-sharing.

7  Q.   And were they able to give you any information about the

8  account holder or the account that had shared the image of

9  child pornography that they were reporting?

10  A.   Yes.  They identified it as having a user name of

11  David.Becker564, and they also provided a logged IP address of

12  68.184.9.53.

13  Q.   Okay.  And that IP address or internet protocol address

14  is the address of the computer that was using -- or the

15  computer connection that was being used to upload this file of

16  child pornography?

17  A.   Correct.

18  Q.   And did they give a date on which this file of child

19  pornography was uploaded?

20  A.   Yes.  They said October 10th of 2002 -- 2022, I'm sorry,

21  at 17:30:02 hours UTC time.

22  Q.   Okay.  And was it clear from the CyberTipline report that

23  Microsoft, someone at Microsoft had actually viewed the image

24  that they were reporting?

25  A.   Yes.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   Q.   And did they state as much in their report?

2   A.   Yes.

3   Q.   And did they give any kind of description of what was

4   depicted in that file that they were reporting?

5   A.   Yes.  They identified it or classified it as an A2

6   category, which, if you turn the page, on the following page

7   it defines what an A2 would be, which is it's an image

8   featuring a prepubescent minor and a lascivious exhibition.

9   Q.   Okay.  And staying on that page that we just turned to,

10  that following page, did the CyberTipline report include any

11  information about whether NCMEC or the National Center for

12  Missing and Exploited Children, had also done any type of

13  verification or review about whether this particular file of

14  suspected child pornography did, in fact, depict a minor and

15  was, in fact, child pornography?

16  A.   Yes.  They indicated that they had matched it to a known

17  file of child pornography via a hash match.

18  Q.   And so in addition to having reviewed the CyberTipline

19  and received that information, did you also view the file that

20  was reported, the file itself?

21  A.   Yes, I did.

22  Q.   And in your judgment, did it depict a prepubescent minor?

23  A.   It did.

24  Q.   And did it depict that prepubescent minor subjected to

25  what might be referred to as a lascivious display of her

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  genitals?

2  A.    Yes.

3  Q.    Okay.  And after reviewing this CyberTipline report, did

4  you take the further step of trying to get any further

5  information about this particular IP address that was used on

6  the internet to upload that child pornography?

7  A.    My supervisor, Sergeant Shanika, submitted what we call a

8  subpoena for the IP address to Charter Communications.  This

9  is prior, though, to me being assigned the CyberTip to

10  investigate.  It came back to an address within St. Louis

11  County, which is at which time he assigned it to me.

12  Q.    Okay.  And was that address on Wenlock Drive?

13  A.    Yes, 12873 Wenlock Drive.

14  Q.    And during the course of your investigation, were you

15  able to determine that that residential address actually was

16  occupied and owned by a David Becker?

17  A.    Yes.

18  Q.    Do you see David Becker in the courtroom today?

19  A.    I don't see him very well right now, but I did see him

20  walk in, yes.  He's next to his attorney.

21  Q.    Okay.  All right.  And can you maybe just describe just a

22  little bit of what he's wearing?

23          **MR. HOGAN:**  Your Honor, we'll stipulate to the

24  identity of my client, David Becker.

25          **MS. ANDERSON:**  Thank you, Your Honor.  Accepted.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1    **THE COURT:** All right. Show the witness has -- or

2    the parties have stipulated to the identity of the defendant.

3            Go ahead.

4        **MS. ANDERSON:** Thank you, Your Honor.

5    Q.   (By Ms. Anderson) And having the CyberTipline report and

6    the verification by your judgment that the file at issue was

7    child pornography and the address and the account user for the

8    internet protocol address that uploaded the child pornography,

9    did you at that time then apply for a search warrant?

10   A.   I did.

11   Q.   And was that to the St. Louis Circuit County -- or

12   St. Louis County Circuit Court?

13   A.   Yes, it was.

14   Q.   And was that Judge Megan Julian to whom you applied for a

15   search warrant and ultimately issued a search warrant in this

16   case?

17   A.   Yes, it was.

18   Q.   Was that search warrant applied for in May, about

19   May 22nd of 2023?

20   A.   Yes, it was.

21       **MS. ANDERSON:** Before I get any further, Your Honor,

22   at this time the government would move Government's Exhibit 2

23   into evidence, the CyberTipline report.

24       **THE COURT:** Is there any objection?

25       **MR. HOGAN:** No, Your Honor.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1          **THE COURT:**  It's admitted.  Do you have a copy of

2   that?

3          **MS. ANDERSON:**  I have one copy, Your Honor.  I have

4   marked on it though.

5          **THE COURT:**  Okay.  Well, you'll get the clerk copies

6   of all these?

7          **MS. ANDERSON:**  Yes, Your Honor, yes.  And may I

8   approach the witness, Your Honor?

9          **THE COURT:**  Go ahead.

10         (Counsel confer.)

11  Q.   (By Ms. Anderson) All right.  Can I ask you,

12  Detective Erwin, do you recognize what has been marked, I

13  believe it's Government's Exhibit 4, entitled Application for

14  Search Warrant?  And let me know if 4 is not correct.

15  A.   Yes.  And on mine it's just, is the actual search

16  warrant.

17  Q.   Okay, 4 is the actual search warrant?

18  A.   Yes.

19  Q.   Then perhaps 3 is the Application for Search Warrant; is

20  that correct?

21  A.   Yes, that is correct.

22  Q.   Thank you so much.  All right.  So Government's

23  Exhibit 3, do you recognize what that document is?

24  A.   Yes.

25  Q.   Can you describe that for the Court.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  A.   It's the application that goes with my affidavit and the

2  actual search warrant that I presented to Judge Julian on

3  May 22nd of 2023.

4  Q.   And did you draft this search warrant?

5  A.   I did.

6  Q.   And are the contents of this search warrant true to the

7  best of your information, knowledge, and belief?

8  A.   Yes.

9  Q.   Was that true on May 22nd when you presented it to

10 Judge Julian?

11 A.   Yes.

12 Q.   And does it remain true today?

13 A.   Yes.

14 Q.   And did you also work with a state prosecutor in the

15 preparation and the delivering of this search warrant, the

16 applying of this search warrant to Judge Julian?

17 A.   I did.

18 Q.   And in that search warrant or in that application for the

19 search warrant, I wanted to turn your attention to your

20 affidavit, which I believe is page 3.

21 A.   Okay.

22 Q.   And in this affidavit are you requesting that the Court

23 order a search warrant to search the residence on

24 Wenlock Drive?

25 A.   I am.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   Q.   Is that, in fact, the residence of the defendant that

2   corresponded with the IP address that uploaded the child

3   pornography?

4   A.   It is.

5   Q.   Okay.  And that was in St. Louis County?

6   A.   Yes.

7   Q.   And did you describe for Judge Julian a little bit about

8   your experience as a detective and specifically your

9   experience investigating child pornography and internet crimes

10  against children?

11  A.   Yes.

12  Q.   And did you indicate to Judge Julian that you had been

13  assigned an investigation involving CyberTipline report

14  140974712?

15  A.   Yes.

16  Q.   And did you inform Judge Julian that in the CyberTipline

17  report, it was reported that Microsoft personnel had viewed

18  the reported file of child pornography and determined that it

19  likely constituted child pornography?

20  A.   Yes.

21  Q.   In addition to that, did you report to Judge Julian that

22  you personally had also viewed the file of suspected child

23  pornography and that you confirmed that it did depict child

24  sexual abuse material?

25  A.   Correct, yes.

1   Q.   Did you describe that image of child pornography for

2   Judge Julian?

3   A.   I did.

4   Q.   And can you just indicate what was the description that

5   you gave to the judge?

6   A.   It's an image file depicting the torso and genitals of a

7   fully nude preadolescent female child, possibly a toddler.

8   The child is shown lying upon her back atop an unknown surface

9   with her legs spread apart.  She is further shown using her

10  fingers to digitally manipulate her vagina in an effort to

11  expose her vaginal opening to the camera.

12  Q.   And I want to turn your attention now to the document

13  before you that is labeled as Government's Exhibit 5.  Do you

14  recognize what that is?

15  A.   Yes.  It's a hard copy printout, a black-and-white

16  printout of that image.

17  Q.   And the government does not intend to move that

18  particular image into evidence as it does constitute child

19  pornography, but I just want you to here as you're testifying

20  look at that image and let me know, do you believe that it is

21  consistent with the description that you gave to Judge Julian?

22  A.   I do.

23  Q.   And was it your estimation and judgment at the time that

24  you applied for this search warrant that that image is of a

25  minor, likely a prepubescent minor?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   A.   Yes.

2   Q.   And does it, in your judgment and estimation, depict that

3   minor in a lascivious display or some type of sexually

4   explicit conduct?

5   A.   Yes, absolutely.

6   Q.   Okay.  And that was your judgment at the time you applied

7   for the search warrant?

8   A.   Correct.

9   Q.   Is it still your judgment in court today?

10   A.   Yes.

11   Q.   Okay.  All right.  And did you inform then -- turning

12   back to the affidavit on the application for a search warrant,

13   did you inform Judge Julian that Charter Communications had

14   indicated that the IP address that uploaded that image of

15   child pornography was being used by the account of David

16   Becker with certain address information?

17   A.   I did.

18   Q.   Okay.  And did -- After reviewing your affidavit and

19   application for a search warrant, did Judge Julian in fact

20   issue a search warrant in this case?

21   A.   She did.

22   Q.   And as you were applying for that search warrant with

23   Judge Julian, did you provide her any substantive information

24   about the case or investigation beyond what you had put in

25   your application and affidavit?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   A.   No, not that I recall.

2   Q.   Okay.  So to the best of your knowledge and information,

3   everything that she utilized to form a judgment that there was

4   probable cause to issue a search warrant was contained in the

5   application for a search warrant and the affidavit that

6   accompanied it?

7   A.   Yes.

8   Q.   So I want to turn your attention to I believe it's

9   Government's Exhibit -- the search warrant.  Is that

10  Government's Exhibit -- I'll have you tell me so I don't make

11  the record even more confusing.

12  A.   Mine says Number 4.

13  Q.   Number 4, Government's Exhibit 4.  Is that, in fact, the

14  search warrant issued by St. Louis County Circuit Court

15  Judge Megan Julian?

16  A.   Yes.

17  Q.   And does that search warrant indicate that it is the

18  defendant's residence on Wenlock Drive in St. Louis County

19  that is to be searched?

20  A.   It does.

21  Q.   All right.  And is it accurate that you and other

22  officers with whom you work executed that search warrant the

23  same day that you received it on May 22, 2023?

24  A.   Yes.

25  Q.   Okay.  And when the search warrant was executed, did you

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   have an opportunity to have contact with the defendant, David

2   Becker?

3   A.    Yes.

4   Q.    And was David Becker interviewed?

5   A.    Yes, he was.

6   Q.    And where did that interview take place?

7   A.    It occurred in my unmarked police vehicle, which was

8   parked near his home.

9   Q.    Okay.  And where was Mr. Becker seated within the

10  vehicle?

11  A.    He was in the front passenger side seat.

12  Q.    And where were you seated then?

13  A.    I was in the front driver's side seat.

14  Q.    And was there anyone else in the vehicle?

15  A.    Yes.  Detective Michael McDonald was also with us, and he

16  was in the rear passenger side seat.

17  Q.    And prior to discussing or asking questions of Mr. Becker

18  about the subject of the investigation, did you provide him

19  his *Miranda* rights?

20  A.    I did.

21  Q.    And did he affirm his understanding of those rights?

22  A.    He did.

23  Q.    And in the course of your interview with Mr. Becker, did

24  he indicate to you that he was, in fact, the sole occupant of

25  the residence that was the subject of the search warrant on

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1    Wenlock Drive?

2    A.    Yes.  He said he had lived there alone for the last

3    ten years.  However, a little later in the interview he

4    amended it to say that he had a female friend living with him

5    at the time of when the CyberTip, the image would have been

6    uploaded to his Skype account.

7    Q.    Okay.  And did he indicate that the internet that goes to

8    that house was password-protected?

9    A.    He did.

10   Q.    And did he indicate to you that he did have and use

11   multiple electronic devices that would have been capable of

12   accessing the internet?

13   A.    He did.

14   Q.    Okay.  Initially did he -- is it accurate that he denied

15   that he had ever searched for or received or seen child

16   pornography?

17   A.    Yes, that's accurate.

18   Q.    And did you actually show him in the course of that

19   interview the image that we discussed on the record and that

20   we labeled as Government's Exhibit 5, did you discuss that

21   with him?

22   A.    Yes, multiple times.

23   Q.    And did he deny that he had ever seen that image before?

24   A.    Yeah, he said he had never seen it.

25   Q.    Did Mr. Becker confirm that, in fact, he had used a Skype

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  account with the user name David.Becker564?

2  A.    Yes, he did.

3  Q.    And did he also tell you anything about his plans to fly

4  to France?

5  A.    Yes.  He said he was scheduled, he had a plane ticket to

6  leave to go to France, I believe it was June 26th or 24th of

7  2023, so about a month after we were executing that search

8  warrant he was about to fly out to France.

9  Q.    And what was it that developed, what information did you

10 or the other officers with whom you worked develop on scene as

11 you were executing the search warrant that caused you to have

12 some interest or concern into this issue of him traveling to

13 France?

14 A.    While reviewing his Telegram accounts and his

15 communications with a user using an account by the name of

16 Flower Power, it was discovered he was communicating, by his

17 own admission as well, with a woman he believed to be named

18 Carol DuPont and then her mother Natalie, and during those

19 communications they were discussing how Mr. Becker and Carol

20 would -- were intending to basically sexually perpetrate upon

21 Carol's 11-year-old daughter Leah and impregnate her.

22 Q.    And when you discussed this with Mr. Becker on that date

23 that the search warrant was being executed, did he indicate to

24 you that in his estimation the woman with whom he was

25 communicating, Carol, was obsessed with the idea of him

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  engaging in sexual abuse of her daughter and that he went

2  along with it?

3  A.   That is correct.

4  Q.   Okay.  And notably in the course of those communications,

5  did the defendant acknowledge to you that he uses various

6  social media accounts?

7  A.   Yes, he did.

8  Q.   And would that include Telegram, Facebook, Instagram,

9  Snapchat?

10  A.   I believe so, yes.

11  Q.   And did you ask him for consent to allow law enforcement

12  to access his accounts to determine if he was using any of

13  them to pursue an interest in child sexual abuse material?

14  A.   Yes, I did.

15  Q.   And did, in fact, David Becker on scene after being

16  mirandized give consent to law enforcement to examine his

17  accounts?

18  A.   Yes, he did.

19  Q.   And those social media accounts that I referenced, those

20  are social media applications and accounts that one can access

21  online, they're not printed publications, they're online

22  material?

23  A.   Yes.

24  Q.   And they would be accessed through some type of digital

25  device that is capable of connecting to the internet?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   A.   Correct.

2   Q.   And amongst the items that were seized by law enforcement

3   in the execution of that search warrant, did it include like

4   Apple, an Apple MacBook, a Dell laptop with a hard drive, and

5   a couple Apple iPhones and an Apple iPad, to the best of your

6   recollection?

7   A.   I believe so, yes.

8   Q.   And is it accurate that once those -- once electronic

9   items belonging to the defendant and seized during the

10  execution of the search warrant at his residence were

11  forensically examined that there was a substantial amount of

12  evidence located that was child sexual abuse material?

13  A.   Correct.

14  Q.   And did that evidence include -- and I'm just going to

15  summarize it, not go through every item that was located, but

16  did it include evidence that the defendant was, in fact,

17  planning to fly from St. Louis to France as he had indicated

18  in his interview?

19  A.   Yes.

20  Q.   And did it include in a Telegram account multiple

21  pictures purporting to be the juvenile minor residing in

22  France that did depict a female child whose appearance was

23  consistent with that of a 10- or 11-year-old minor?

24  A.   Yes.

25  Q.   And were there multiple communications between the

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  defendant and an individual, who the communications were

2  referred to as Carol, where they discuss the sexual abuse of

3  that particular 11-year-old minor?

4  A.   Yes.

5  Q.   Including plans that he would impregnate her?

6  A.   Yes.

7  Q.   Did his electronics also include images of child

8  pornography or child exploitation material such as an image of

9  a nude female minor laying atop another nude individual in

10 like a park-like setting?

11 A.   I'm not familiar with that specific image.  I'm sorry, I

12 didn't review the actual images found.  I know that there were

13 approximately 32 images found, and seven were confirmed by

14 NCMEC later as confirmed files of child pornography.

15 Q.   All right.  And the execution of the search warrant, was

16 that -- was the scope of the execution of that search warrant

17 as well as the items seized, was that consistent with what was

18 ordered by Judge Julian?

19 A.   Yes, it was.

20         **MS. ANDERSON:**  Your Honor, I have no further

21 questions at this time.  I would ask at this time to move

22 Government's Exhibits 3 and 4 into evidence, and that is the

23 application and affidavit for the search warrant as well as

24 the search warrant itself, Your Honor.

25         **MR. HOGAN:**  There is an image attached to Exhibit 4?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1           **THE WITNESS:**  It's marked Exhibit 6.

2           **MR. HOGAN:**  Okay.

3           **MS. ANDERSON:**  I think it's Exhibit 5; is that

4    right?

5           **THE WITNESS:**  Oh, I'm sorry.  It looks like a 6 to

6    me, but yes, it is 5.

7           **MS. ANDERSON:**  That's my handwriting.  So the

8    government is not actually requesting to move Exhibit 5, which

9    is an image of child pornography, into evidence.

10          **THE COURT:**  Was that something that the judge looked

11    at?

12          **MS. ANDERSON:**  No.  And I can follow up with a

13    question to establish that on the record if the Court would

14    allow.

15          **THE COURT:**  Go ahead.

16    Q.    (By Ms. Anderson) Detective Erwin, you have in front of

17    you Government's Exhibit 5, which is the image that was the

18    subject of the CyberTipline report, an image that you

19    determined in your judgment to be child pornography.  Did you

20    show that to Judge Julian?

21    A.    No, I did not.

22    Q.    Have you ever in the course of applying for a search

23    warrant based on a CyberTipline report actually asked the

24    judge to view or to include as part of your affidavit child

25    pornography, videos, or images?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   A.   No.   I always bring the files with me when I apply, but

2   no judge has ever asked to actually see these images or

3   videos.

4          **MS. ANDERSON:**   Nothing further, Your Honor, except

5   just to move Exhibits 3 and 4 into evidence at this time.

6          **THE COURT:**   Okay.   Those will be admitted.

7          **MR. HOGAN:**   Good afternoon, Your Honor.   May it

8   please the Court.

9          **THE COURT:**   Go ahead.

10                     **CROSS-EXAMINATION**

11  **BY MR. HOGAN:**

12  Q.   Detective Erwin, what is a known image of child

13  pornography?

14  A.   It's basically an image or file of child pornography that

15  has been identified where the child in the image or video has

16  been identified as an actual child.

17  Q.   And is that identification done through the National

18  Center for Missing and Exploited Children?

19  A.   Law enforcement does the notification, and then they

20  submit what we call an identified series to the National

21  Center for Missing and Exploited Children who then keep a

22  database of all known files.

23          **THE COURT:**   You're going to need to slow down a

24  little bit and try and keep your voice up too.

25          **THE WITNESS:**   Would you like me to repeat that, Your

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   Honor?

2         **THE COURT:**  I don't know that we need it repeated,

3   but you're getting into some technical language, so I think it

4   would be worthwhile slowing down a bit and keeping your voice

5   up.

6         **THE WITNESS:**  Certainly.

7   Q.   (By Mr. Hogan) So a known image of child pornography is

8   when the image in question, the child in that image has been

9   physically identified; correct?

10  A.   I don't know, if you said physically, I'm not quite sure

11  every means by which law enforcement has identified that

12  child, but I know that it is when law enforcement has either

13  found that child or somehow confirmed that that is an actual

14  child featured in the image or video.

15  Q.   So they know who the person is in the image?

16  A.   I don't know if they know the actual identity all the

17  time.  I also know that there are medical doctors who also

18  identify --

19        **MR. HOGAN:**  Objection; nonresponsive.

20  Q.   (By Mr. Hogan) I'm not asking about medical doctors.  I'm

21  asking you about a known image of child pornography.

22        **THE COURT:**  Let her finish her answers.  I don't

23  think that will overly impair our hearing.

24  A.   From my understanding, they also use medical doctors and

25  images where the child has not been located who then

*Evidentiary Hearing - 12/12/24*                                    *Pg 27*

1    identifies it based off of their assessment that that is a

2    child being featured in the image or video.

3    Q.    (By Mr. Hogan) So whether they know the actual name of

4    the person, more importantly, in that known image of child

5    pornography, that is an image of a real person who's underage;

6    correct?

7    A.    Correct.

8    Q.    So we know this person, we know this image has been

9    certified as an image of child pornography?

10   A.    Yes.

11   Q.    Okay.  Now, are you aware that the government -- well,

12   you applied for your search warrant on May 22nd of what year?

13   A.    2023.

14   Q.    Okay.  Are you aware on September 9, 2024, the government

15   submitted a request to the National Center for Missing and

16   Exploited Children asking whether or not the image you

17   submitted to Judge Julian was, in fact, a known image?  Are

18   you aware of that?

19   A.    I am, yes.

20   Q.    And on September 9th of 2024, the National Center for

21   Missing and Exploited Children informed Ms. Jillian that that

22   actually was a known image of child pornography; correct?

23   A.    I'm not certain of the dates, but the rest of that is

24   correct.

25   Q.    Okay.  Well, let me make this date simple.  On May 22nd

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  or any time before, did you, Detective, the person filling out

2  the affidavit, did you make a request to the National Center

3  for Missing and Exploited Children to find out whether or not

4  the image, the one image you had, was a known image of child

5  pornography?

6  A.   I did not make that request, no.

7  Q.   So no, correct, you did not?

8  A.   That's what I said, yes; no.

9  Q.   Now, pointing your attention to Exhibit 3, which would be

10 your affidavit which you gave to the judge, do you have it up

11 there?

12 A.   If you're referring to the affidavit, I have that as

13 Exhibit 4, I believe.  Yes.

14 Q.   Do you have --

15 A.   Oh, wait.  No, I'm sorry.

16 Q.   It is Exhibit 3; correct?

17 A.   I'm sorry.  On top it's marked Application.  Sorry, yes,

18 Exhibit 3.

19 Q.   Would you turn to paragraph 3 where it begins, "In March

20 of 2023."

21 A.   Yes.

22 Q.   Okay.  So when you applied for this search warrant, you

23 told Judge Julian that Detective Shanika told you that a

24 CyberTip was received; correct?

25 A.   Sergeant Shanika, yes.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  Q.   Yes.  You said that a CyberTip was received; correct?

2  A.   From the National Center for Missing and Exploited

3  Children, yes.

4  Q.   In paragraph three, does it say that it was identified as

5  a known image?

6  A.   No; I don't even refer to the image in paragraph three.

7  Q.   Moving on to paragraph four, it says that the CyberTip,

8  lastly, advised Microsoft personnel had viewed the reported

9  file uploaded to the account and determined it likely

10 constituted child pornography; correct?

11 A.   Correct.

12 Q.   So they're not saying it actually was.  They're saying it

13 likely constituted child pornography; correct?

14 A.   Correct.

15 Q.   They're not saying it's a known image, are they?

16 A.   No, they're not.

17 Q.   Now, it says Microsoft personnel is what you told the

18 judge viewed it; correct?

19 A.   Yes.

20 Q.   Okay.  Would you please tell this judge, who from

21 Microsoft viewed this image?

22 A.   Microsoft does not tell us that.

23 Q.   So you don't know?

24 A.   I do not know the person, no.

25 Q.   Do you know when they looked at it?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   A.    I don't.

2   Q.    Did they give you a report like describing everything?

3   A.    What I was provided with in the report that they

4   submitted is the CyberTip.

5   Q.    Okay.  That's it?

6   A.    That's all I was provided with, yes.

7   Q.    And they said it likely constituted child pornography;

8   correct?

9   A.    May I refer to the CyberTip to see how they actually

10  phrase it?

11  Q.    No, I'm asking about your search warrant.

12  A.    In my search warrant, that is what I phrase, yes.

13  Q.    And that's what you showed the judge; correct?

14  A.    Correct.

15  Q.    On May 22nd?

16  A.    Correct.

17  Q.    2023; correct?

18  A.    Correct.

19  Q.    Okay.  And then in paragraph five, you tell the judge

20  that, in your opinion, it constitutes child pornography;

21  correct?

22  A.    Correct.

23  Q.    An image of child pornography.  Now, this image, you

24  couldn't see the person's face in this photo, could you?

25  A.    No, you cannot.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   Q.   Okay.  Did you have -- you mentioned medical doctors.

2   Did you have a medical doctor view this photograph?

3   A.   I did not.

4   Q.   And earlier, speaking with the prosecuting attorney, you

5   said -- I believe you used the term confirmed by, you call it

6   NCMEC, National Center for Missing and Exploited Children?

7   A.   I'm sorry, where are you referring to?

8   Q.   I'm referring to, do you remember using the term "a

9   confirmed image by the National Center for Missing and

10  Exploited Children" when speaking with the prosecutor?

11  A.   I think you would have to bring me back that section

12  where we spoke about that.

13  Q.   Now, in this search warrant or in your investigation, did

14  you uncover any search terms used by the Skype address

15  registered to Mr. Becker searching for child pornography?

16  A.   I don't believe so.

17  Q.   You say this was one image you found; correct?

18  A.   No, we were provided with just one image.  We found

19  multiple images on his devices.

20  Q.   This is about the search warrant.  So I'm going back to

21  May 22nd, okay, to be clear.  On May 22nd how many images did

22  you have?

23  A.   They provided us with one image.

24  Q.   So you had one image; correct?

25  A.   Correct.

1    Q.    One image and no search terms; correct?

2    A.    That's correct.

3    Q.    Did you do any other searches to try to find out if any

4    other images were downloaded?

5    A.    I'm sorry, what do you mean, sir?

6    Q.    Did you -- you're an investigator.  You've been with this

7    unit 13 years; correct?

8    A.    Correct.

9    Q.    You're a police officer for over 20 years; correct?

10   A.    Correct.

11   Q.    You were presented with one image of possible child

12   pornography.  What other investigation did you do to find

13   other images?

14   A.    Sir, it's not possible child pornography; it is child

15   pornography.  It's clear to anyone who looks at that image

16   that it's child pornography.

17   Q.    Okay.  You're saying that, but then in your affidavit to

18   the judge you told the judge it likely constituted child

19   pornography --

20   A.    I said Microsoft's personnel --

21   Q.    -- Microsoft said; correct?

22   A.    -- said that.  I said I confirmed it by looking at it

23   myself as an image of child pornography.

24   Q.    And that's your opinion of being child pornography;

25   correct?

1   A.   That is my professional opinion as an ICAC investigator

2   for 13 years.

3   Q.   And I'm asking you about other investigation of looking

4   at one image.  Did you -- What other images did you find

5   before applying for a search warrant?

6   A.   I was not provided with any other images, and I did not

7   locate any other images.  This is all I was provided with.

8   Q.   So your investigation consisted of finding his address,

9   correct, Mr. Becker?

10  A.   I'm sorry, rephrase that -- or not rephrase that, but

11  could you --

12  Q.   Let me rephrase it this way.

13  A.   -- please repeat that.

14  Q.   Tell the judge, other than getting this image from

15  someone else and looking at the image, what investigation did

16  you do after that?

17  A.   We do deconfliction, so we go through the ICAC data

18  system to see if that IP address had been reported previously.

19  We also run the address once we have a subpoena response to

20  see if there's been any prior investigations, stuff along that

21  nature.

22        I did review the CyberTip.  I reviewed the image.  I

23  reviewed the subpoena, made sure everything was consistent and

24  matching, and then I also contacted the AmerenUE to confirm

25  that utilities were still registered to Mr. Becker, and then I

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   did background on Mr. Becker.

2   Q.   Okay.  And from the result of that investigation, were

3   any other images located?

4   A.   No, sir.

5   Q.   Were any search terms found, used?

6   A.   No, sir.

7   Q.   So when you applied for a warrant with Judge Julian on

8   May 22nd, you had one single image; correct?

9   A.   I had a report of a crime, yes, a felony crime.

10  Q.   I'm asking you, you had one image; correct?

11  A.   Yes, which is a felony crime.

12  Q.   Okay, thank you for your opinion.  And you chose not to

13  send an email to the National Center for Missing and Exploited

14  Children to verify whether or not it was a known image?

15  A.   The National Center for Missing and Exploited Children

16  did indeed note in the CyberTip that it was an apparent file

17  of child pornography based off of MD5 hash match.

18  Q.   Would you show us where in your affidavit to the judge

19  you state that.

20  A.   I did not put that in there.

21          **MR. HOGAN:**  No further questions, Your Honor.

22          **THE COURT:**  Okay.  Ms. Anderson?

23          **MS. ANDERSON:**  Yes, Your Honor, briefly.

24

25

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1          **REDIRECT EXAMINATION**

2    **BY MS. ANDERSON:**

3    Q.    Detective Erwin, I think we have established that the

4    National Center for Missing and Exploited Children in the

5    CyberTipline report that commenced this investigation did note

6    that this was a known identified image of child pornography?

7           **MR. HOGAN:**  Objection to the form of the question,

8    Your Honor.  This is testimony.

9           **THE COURT:**  It's overruled.

10   Q.    (By Ms. Anderson) Did confirm it was a known image of

11   child pornography based on a hash value match?

12   A.    Yes, but the way they describe it in that report is

13   "apparent child pornography."  They don't say "known image."

14   Q.    Okay, "apparent child pornography."  And so in the report

15   NCMEC indicates that while they can tell that it is a

16   suspected file of child pornography because they've seen that

17   hash value before on that image, they also indicate that they

18   didn't actually look firsthand at the image; is that correct?

19          **MR. HOGAN:**  Objection, Your Honor.

20          **MS. ANDERSON:**  Let me rephrase.

21   Q.    (By Ms. Anderson) Did NCMEC indicate whether they had

22   actually -- anyone at NCMEC had laid eyes on the image and

23   rendered a judgment by looking at the image?

24   A.    No; they indicated they had done it via a hash match.

25   Q.    But Microsoft, did they indicate in the CyberTipline that

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  someone at Microsoft had actually viewed the image and

2  rendered an opinion about whether it was suspicious for child

3  pornography?

4  A.    Yes.  They classified it as A2, prepubescent and a

5  lascivious display of genitalia.  Sorry, I can't say that

6  word.

7  Q.    And you did include in your affidavit to Judge Julian

8  that Microsoft had actually looked at the image at issue and

9  believed that it was suspected to be child pornography?

10 A.    Correct.

11 Q.    And then you also told Judge Julian that you had looked

12 at the actual image?

13 A.    Correct.

14 Q.    And that it was your judgment that it was -- did depict a

15 prepubescent minor, possibly a toddler, subjected to sexual

16 abuse?

17 A.    Yes.

18 Q.    Okay.  Let me ask you about your ability to render an

19 opinion that an individual you see is a juvenile.  Are there

20 cases involving late --

21        **MR. HOGAN:**  Objection, Your Honor.  Outside the

22 scope of my cross-examination.

23        **THE COURT:**  I'm going to let it go.  Go ahead.

24 Q.    (By Ms. Anderson) Defense counsel asked you some

25 questions about why -- whether you had a doctor give an

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1    opinion, so that's what I want to ask you about.  Are there

2    sometimes cases that involve late-year teenagers where a

3    medical opinion might be useful or even warranted to determine

4    whether that might be a minor?

5    A.    Yes.

6    Q.    Are there also cases that in your estimation and your

7    judgment and your experience involve individuals of such

8    anatomical development that it is just abundantly clear that

9    they appear --

10            **MR. HOGAN:**  Objection; leading.

11   Q.    (By Ms. Anderson) -- to be a child?

12            **MR. HOGAN:**  These are not questions.

13            **THE COURT:**  Okay.  So this is a hearing in front of

14   me, and so I'm going to allow it to go forward; okay?  It's

15   overruled.  Go ahead.

16   A.    I'm sorry, could you repeat that?

17   Q.    (By Ms. Anderson) Are there also cases you have worked in

18   which the individual depicted in the child exploitation

19   material was very young and, therefore, just quite obviously a

20   minor?

21   A.    Yes, absolutely.

22   Q.    Do you believe that -- and I'm going to ask you both

23   about your personal judgment as well as your professional

24   judgment.

25            On a personal level, do you think that individuals,

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1   for example, jurors, can look at an image, or a judge, and

2   render an opinion that it does depict a minor, particularly

3   when that minor is clearly prepubescent?

4   A.   Absolutely.

5   Q.   Now, do you have personal experience viewing children in

6   your life?

7   A.   Yes.

8   Q.   Tell me just a little bit about that.  When have you had

9   occasion --

10          **MR. HOGAN:**  Objection, Your Honor.

11          **THE COURT:**  I'm not sure her general viewing of

12   children is something we need to get into.

13          **MS. ANDERSON:**  Sure.

14   Q.   (By Ms. Anderson) Let me ask then just very briefly,

15   turning to your professional experience.  Unlike perhaps a

16   juror or even certainly much more so than a judge, have you

17   had occasion to view a child or sexual exploitation images?

18   A.   Yes, I have.

19   Q.   And to be able to discern when they depict a body or an

20   individual that is very clear, clearly a minor because of --

21          **MR. HOGAN:**  Objection; leading, Your Honor.  These

22   are not questions.  These are statements.

23          **THE COURT:**  Okay, so it's a suppression hearing, and

24   the Rules of Evidence are a little bit looser here, so I'm

25   going to allow it, but I think it's worthwhile to try and ask

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1    more open-ended questions.

2    Q.    (By Ms. Anderson) Let me ask you, tell me about your

3    experience viewing sexual exploitation images and determining

4    whether they depict a minor.

5    A.    So I've seen everything from infants, to include

6    newborns, that were not confirmed files of child pornography

7    that we investigated, all the way up to individuals who were

8    17.  I couldn't even give you a number.  I've seen images,

9    videos.  I mean, I would estimate well over 50,000 files of

10   child pornography now, well over that, of various ages.

11         If we're ever -- like if we can't tell it's a child,

12   say they're a teenager, maybe an older teenager, then we do

13   not do search warrants unless we have some kind of chat log

14   that goes with it indicating that person knew it was someone

15   who was 17 or younger.

16         But whenever we have clear pictures or videos where

17   it is certainly a child that no individual, no reasonable

18   individual anyway, could look at that and construe it as

19   anything but a child, then we usually almost always will do a

20   search warrant.

21   Q.    All right.  And let me ask you specifically then about

22   Government's Exhibit 5, the image that you described to

23   Judge Julian in your search warrant affidavit.  Do you have

24   that exhibit with you?

25   A.    I do.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  Q.   Can you describe, based on your personal and professional

2  experience, what is it about the individual depicted in

3  Government's Exhibit 5 that caused you to render the opinion

4  that this was a prepubescent minor subjected to a lascivious

5  display of her genitals?

6  A.   Certainly.  So it's a close-up view of the vaginal

7  opening of a very young female child.  What makes me believe

8  it's a very young female child who has not entered puberty and

9  possibly might be a toddler is that there are no pubic hair,

10  but not even just that.  There's no like pores where, you

11  know -- I don't know how you describe it -- but, you know,

12  where pubic hair would grow.  There's absolutely no breast

13  development.

14         The child is kind of cherubic, like a young child.

15  The hands are also very small with very stubby fingers, very

16  tiny fingernails.  There's no hip -- as far as I can tell,

17  there's no hip development.

18         In context with that image also the child is laying

19  on what looked like little kids' bedsheets.

20         So it's just the entirety of that image indicates

21  that this is a very young child, female child.

22  Q.   All right.  And have you had multiple occasions to

23  describe a video or a file and opined that it was child

24  pornography to a judge in the process of applying for a search

25  warrant?

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  A.    Yes.

2  Q.    Okay.  And so that's something that you do routinely?

3  A.    Yes.

4  Q.    Okay.  Let me ask then I think just my last question

5  regarding one image.  There were several questions asked of

6  that.  Is it illegal to -- is there a number of images of

7  child pornography that you can legally own as an individual?

8       **MR. HOGAN:**  Objection.  Calls for a legal

9  conclusion.

10      **THE COURT:**  Well, it calls for a legal conclusion,

11  but I'm going to allow the detective to state what she thinks

12  about it.

13  A.    No, there is no limitation.  There's no maximum or

14  minimum number.  One image, one file, one video, that's

15  possession, and in this case it said photo-sharing; it was an

16  upload.  So it indicates the person was distributing child

17  pornography as well.

18  Q.    (By Ms. Anderson) And as part of the process of you

19  applying for a search warrant, you do have to render an

20  opinion that there is sufficient probable cause to believe

21  that whatever it is you --

22      **MR. HOGAN:**  Objection; leading, Your Honor.  Also

23  calling for legal conclusions.  That's what we're here for,

24  whether or not there's probable cause.

25      **THE COURT:**  It's overruled.  Go ahead.

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  Q.   (By Ms. Anderson) You have to make the determination as a

2  detective that you believe there is probable cause to search a

3  specific thing -- in this case a residence -- because you

4  believe there's evidence of a crime that you've identified,

5  typically identified what that crime is; is that correct?

6  A.   That is correct.

7  Q.   Okay.

8       **MS. ANDERSON:**  I have nothing further, Your Honor.

9  Thank you.

10      **THE COURT:**  Any further questions?

11      **MR. HOGAN:**  No, Your Honor.

12      **THE COURT:**  Okay.  Any further -- you can step down.

13  Any other witnesses?

14      **MS. ANDERSON:**  No, Your Honor.

15      **THE WITNESS:**  Your Honor, what should I do with the

16  exhibits?

17      **THE COURT:**  Just hand it over to the assistant U.S.

18  attorney.  Okay, so come on up here, Mr. Hogan.  So you don't

19  have any evidence you want to put on?

20      **MR. HOGAN:**  No, Your Honor.

21      **THE COURT:**  Okay.  So at this point the hearing is

22  concluded.  Typically I give the parties time to file

23  something that encompasses what we just did.  I usually give

24  the defendant 30 days.  I give the U.S. attorney 14 days after

25  that.  So rather than talk about it right now, I would rather

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

1  see it in writing.  So let's go ahead and in 30 days from

2  today for the defendant.  If there is an interest in

3  additional time, just put it in writing.  Same thing with the

4  assistant U.S. attorney, and we'll go from there.

5         **MR. HOGAN:**  Thank you, Your Honor.

6         **THE COURT:**  Thank you.

7         **MS. ANDERSON:**  Your Honor, may I inquire, is it the

8  Court's preference to take the exhibits that were moved into

9  evidence now, or should I just attach them to my --

10        **THE COURT:**  I mean, I prefer to have the exhibits

11 that were introduced at this hearing at the hearing so they

12 get in with the material I put together today.  So if you

13 don't have them, just get them and bring them back down maybe

14 to Lauren, and let's get it today.  If you want to attach them

15 to your post-hearing brief, that's fine too, but I need --

16 generally it helps me to have a stack of exhibits at any

17 hearing while you're talking about them.

18        **MS. ANDERSON:**  Thank you, Your Honor.  And I have

19 provided them to your clerk, Government's Exhibits 1 through

20 4, and the government did not move in Exhibit 5.

21        **THE COURT:**  Okay.  All right.  Take care.

22        (The hearing concluded at 2:29 p.m.)

23

24

25

*USA v. DAVID S. BECKER | 4:24-CR-00227-SEP*

<u>CERTIFICATE</u>

I, Kristine A. Toennies, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 44 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 30th day of July, 2025.


*/s/ Kristine A. Toennies*
Kristine A. Toennies, RMR, CRR, CRC, CCR
Official Court Reporter